# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| **JACKIE E. DRUMMOND,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | )   2:10-CV-02580-KOB |
| | ) |
| **MICHAEL J. ASTRUE,** | ) |
| **Commissioner of the Social** | ) |
| **Security Administration,** | ) |
| | ) |
| **Defendant.** | ) |
| | ) |

## MEMORANDUM OPINION

## I. INTRODUCTION

On February 21, 2006, the claimant, Jackie E. Drummond, filed a Title II application for disability insurance benefits and a Title XVI application for supplemental security income benefits. (R. 89-97). Although the claimant alleges disability beginning on December 31, 2004 (R. 89), he stated that he became unable to work on July 31, 2005. (R. 92). After the Social Security Administration initially denied his claims, the claimant filed a timely written request for a hearing before an Administrative Law Judge. (R. 75). The ALJ held a hearing on February 12, 2008. (R. 20). In a decision dated September 24, 2008, the ALJ found that the claimant was not disabled as defined in the Social Security Act, and thus, was ineligible for supplemental security income. (R. 20).

On October 14, 2008, the Appeals Council denied the claimant's request for review. (R. 1-3, 7). Consequently, the ALJ's decision became the final decision of the Commissioner of the Social Security Administration. See 20 C.F.R. § 404.955. Because the claimant has exhausted his

administrative remedies, the case is now ripe for judicial review. This court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1382(c)(3). For the reasons stated below, the court affirms the Commissioner's decision.

## II. ISSUES PRESENTED

The claimant presents the following issues for review: (1) whether the ALJ's hypothetical posed to the vocational expert setting forth the claimant's residual functional capacity ("RFC") of a reduced range of light work accurately described the claimant and his limitations; and (2) whether the ALJ committed reversible error in not awarding benefits based on the medical vocational guidelines or Grid Rules.

## III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited. This court must affirm the Commissioner's decision if the Commissioner applied the correct legal standards and if substantial evidence supports the factual conclusions. See 42 U.S.C. § 405(g); Graham v. Apfel, 129 F.3d 1420, 1422 (11th Cir. 1997); Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987).

"No... presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." Walker, 826 F.2d at 999. This court does not review the Commissioner's factual determinations *de novo*. The court will affirm those factual determinations that are supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971).

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings." Walker, 826 F.2d at 999. A reviewing court must not look only to those parts of the record that support the decision of the ALJ, but also must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. Hillsman v. Bowen, 804 F.2d 1179, 1180 (11th Cir. 1986).

### IV. LEGAL STANDARD

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." To make this determination, the Commissioner employs a five-step, sequential evaluation process:

> (1) Is the claimant presently unemployed?
> (2) Is the claimant's impairment severe?
> (3) Does the claimant's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. pt. 404, subpt. P, app. 1?
> (4) Is the claimant unable to perform his or her former occupation?
> (5) Is the claimant unable to perform any other work within the economy?
>
> An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

McDaniel v. Bowen, 800 F.2d 1026, 1030 (11th Cir. 1986); 20 C.F.R. §§ 404.1520, 416.920.

The Listing of Impairments ("Listing") describes impairments that are considered severe enough to prevent a person from doing any gainful activity for each of the major body systems. 20 C.F.R. § 404.1525(a). Under step three, the claimant has the burden to prove that his impairment meets or equals a Listing. Barron v. Sullivan, 924 F.2d 227, 229 (11th Cir. 1991). To

"meet" a Listing, a claimant must have a diagnosis that is included in the Listings and must provide medical reports documenting that the conditions meet the specific criteria of the Listing for the required duration. 20 C.F.R. §§ 404.1525(a)-(d). To "equal" a Listing, the medical findings must be "at least equal in severity and duration to the listed findings." 20 C.F.R. § 404.1526(a). If the claimant contends that an impairment "equals" a Listing, the claimant must present evidence that describes how the impairment has such an equivalency. Wilkinson ex rel. Wilkinson v. Brown, 847 F.2d 660, 662 (11th Cir. 1987); see also Shinn ex rel. Shinn v. Comm. of Soc. Sec., 391 F.3d 1276, 1285 (11th Cir. 2004) (explaining that the statement in Wilkerson is not limited to only medical evidence).

If the claimant has a severe impairment that does not equal or meet the severity of a listed impairment, the examiner proceeds to step four. At step four, the ALJ assesses the claimant's RFC, which measures whether the claimant can perform past relevant work despite his impairment. See 20 C.F.R. § 404.1520(f); see also Crayton v. Callahan, 120 F.3d 1217, 1219 (11th Cir. 1997). The claimant bears the burden of demonstrating that he cannot return to his past relevant work. Lucas v. Sullivan, 918 F.2d 1567, 1571 (11th Cir. 1990). To support a conclusion that the claimant is able to return to his past relevant work, the ALJ must consider all the duties of that work and evaluate the claimant's ability to perform them in spite of his impairments. Lucas, 918 F.2d at 1574.

For a vocational expert's testimony to constitute substantial evidence, the ALJ must pose a hypothetical question to the vocational expert that comprises all of the claimant's impairments. Vega v. Comm. of Soc. Sec., 265 F.3d 1214, 1220 (11th Cir. 2001); see also Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999). However, the ALJ is not required to include findings in the

hypothetical that the ALJ determines to be unsupported. Crawford v. Comm. of Soc. Sec., 363 F.3d 1155, 1161 (11th Cir. 2004).

## V. FACTS

At the time of the administrative hearing, the claimant was fifty-four years old with a general equivalency diploma ("G.E.D."). (R. 30). His past work experience includes employment as a convenience store cashier and motel clerk/auditor. (R. 20, 31, 122-123, 134-140). Although the claimant alleges a disability onset date of December 31, 2004 (R. 89), he worked until he quit his job on July 31, 2005. (R. 92). The ALJ considered the later date as his disability date. (R. 13). Regardless of the disability date, the claimant did not file for Social Security Benefits until February 18, 2006. (R. 89-91). The claimant's severe medical impairments include affective mood disorder, chronic obstructive pulmonary disease, hepatitis C, fatigue, methadone dependance, and a history of peptic ulcer disease that resulted in a partial gastrectomy. (R. 15).

*Mental and Physical Limitations*

In 1976, the claimant had a bleeding ulcer, which led to the removal of half of his stomach. (R. 285). With a height of around 6 feet[1], the claimant is notably thin for his height. Records indicate that his weight has fluctuated from a peak of 155 pounds on July 17, 2002 (R. 288) to a low of 125 pounds on June 20, 2005. (R. 281). The claimant's last weight noted in the record is 136 pounds on May 12, 2008. (R. 391). No records exist confirming that he is experiencing further weight loss, nor that he is suffering from a persistent gastrointestinal disorder. (R. 27).

---

[1]The claimant's recorded height varies in the record. The claimant testified as being 6 feet, 1 inch, while the DDS determination measured him at 5 feet, 11 inches. Pl.'s Br. at 4. Regardless, his weight does not correspond to his height.

On January 17, 2002, nurse practitioners at Capstone Rural Health Clinic first diagnosed the claimant with depression and prescribed Zoloft. (R. 294). The claimant skipped multiple follow-up appointments on March 18, 2002 (R. 292), April 4, 2002 (R. 291), May 3, 2002 (R. 290), and May 8, 2002 (R. 289). All in all, records suggest that the claimant missed at least seven appointments at Capstone. (R. 278, 280, 282, 289, 290, 291, 292).  When the claimant finally went for a follow-up appointment on July 7, 2002, Capstone altered his anti-depressant prescription, and ultimately increased his dosage. (R. 286, 283) The complainant continued to be treated for depression at his subsequent visits to Capstone from 2004 to 2007. (R. 279 - 94, 355, 359 - 60, 368, 370-71). Despite his various depression diagnoses, the claimant stated he gets along with everyone and has friends come over to his house for social visits. (R. 144). In mid-2005, the claimant stated that he "was doing better with the increased dose" of the Zoloft (R. 281); later that year, he denied having any problems with that medication. (R. 279).

On July 30, 2004, the claimant complained of being "physically drained" for the previous six months and stated that he lacked strength and energy. (R. 285). Nurse practitioners at Capstone diagnosed the claimant with fatigue and suggested over-the-counter B-Complex vitamins. (R. 285). The claimant did not complain of fatigue again until one of his subsequent visits to Capstone in May 2008. (R. 391). At the request of the claimant's counsel, the claimant's treating CRNP at Capstone, Foster Jones, submitted a short statement asserting that "depression cause[s] fatigue." (R. 389). However, the claimant stated at trial that the Zoloft helps his depression and "keeps [him] from getting depressed." (R. 39).

On January 29, 2006, Dr. Bhavesh Patel, a treating internist at Walker Baptist Medical Center, examined the claimant when he presented to the Emergency Room with a persistent

6

cough, shortness of breath, and production of yellow-green sputum. (R. 177). The claimant was admitted to the hospital that day. Id. Dr. Patel diagnosed the claimant with "community acquired pneumonia" and prescribed Levaquin, bronchodilators, and supplemental oxygen. (R. 176). Because of the claimant's difficulty breathing, his attending physician at Walker Baptist ordered a CT scan and x-ray of the claimant's chest. (R. 193 - 96).  Dr. Scott Grumley and Dr. Kenneth Hager, both radiologists, interpreted the results from the CT scan and x-ray and found the diagnosis consistent with the claimant's complaint of respiratory distress. (R. 193 - 94).

After the claimant's respiratory problems worsened, the physicians at Walker Baptist Medical transferred him to Princeton Baptist Medical Center, where he was hospitalized for pulmonary treatment and intensive care. (R. 196, 206). On February 13, 2006, Dr. Chris Phillips, a treating internist, diagnosed the claimant with severe pneumonia, anemia, chronic methadone dependancy, depression, stabilized peptic ulcer disease, and resolved encephalopathy.[2] (R. 205). After finding the claimant's condition to be "much improved" less than two weeks later, Dr. Phillips discharged the claimant. Dr. Phillips also noted that the claimant's hypotension and orthostatics had resolved at discharge and that he was walking without difficulty and without shortness of breath. (R. 206 - 207).

The claimant's respiratory problems are not a recent development. The claimant has a long history of smoking, having only quit about three months prior to the ALJ hearing. (R. 56, 385). On February 1, 2006, the claimant reported that he smoked about a pack a day for "all his life." (R. 209, 316). The records indicate a diagnosis of COPD as early as September 8, 2006. (R.

---

[2]Encephalopathy is defined as an altered mental state, or malfunction of the brain, accompanied by physical changes of the body.

370).

On May 3, 2006, Dr. Charles Houston, a consulting psychologist, conducted a mental evaluation of the claimant. Dr. Houston diagnosed the claimant with a mild to moderate depressive disorder (not otherwise specified), methadone dependance, drug abuse of different kinds, and personality disorder (not otherwise specified). Despite the diagnoses, Dr. Houston found that the claimant was capable of performing basic daily activities. (R. 316). Although he might have difficulty meeting demands of competitive employment, he was able to concentrate, persist, and adapt to changes and conditions in the evaluation. (R. 317).

The claimant also has a history of alcohol abuse. The claimant admitted to drinking four to five beers per day as of February 1, 2006. (R. 209, 212). While he claimed to have decreased his daily consumption to two beers by March 16, 2006 (R. 132), medical records from Capstone from May 15, 2007 indicate that the claimant had again increased his daily intake up to six beers. (R. 360). At that same visit to Capstone, the claimant's treating CRNP counseled the claimant to stop drinking because his tests revealed the presence of a positive hepatitis C antibody. (R. 260). The claimant ultimately tested positive for hepatitis C at his follow-up appointment two weeks later. (R. 359). Capstone referred the claimant to the University of Alabama at Birmingham Liver Center for evaluation of chronic hepatitis C, but he was denied an appointment because of his continued alcohol use. (R. 357 - 58). At the ALJ hearing, the claimant admitted to drinking "a couple [of] times a week," having only recently cut back from drinking six beers a day. (R. 32 - 33).

In addition to alcohol, the claimant's past drug use is extensive. He began using drugs at age 14, and only quit a few years ago when he began methadone treatments after quitting his job

in July 2005. (R. 32). The claimant admits to having abused a large variety of drugs in the past (R. 385), including engaging in intravenous (IV) drug abuse. (R. 360). Medical records from Birmingham Metro Treatment Center from March 2006 indicate that the claimant was "not motivated to abstinence and does not desire detox and discharge." (R. 374). Additionally, the claimant was "functional while on Methadone maintenance as eviden[ced] by [his] occupational and/or social functioning and self-expressed desires." (Id.). When the claimant was examined at Princeton Baptist in 2006 for pneumonia, Dr. Chris Phillips lowered his methadone dosage to 95 milligrams, twice daily, which the claimant tolerated well. (R. 307). However, the claimant testified at the ALJ hearing on February 12, 2008 to taking 320 milligrams per day. (R. 46).

*The ALJ Hearing*

After the SSA denied the claimant's Title II and Title XVI applications, the claimant requested and received a hearing before an ALJ. (R. 62-65). At the ALJ hearing held on February 12, 2008, the claimant testified that his difficulty breathing, his shortness of breath, was his "main problem." (R. 31). He further stated that he gets winded really easily, after doing anything "continually for a couple of minutes," and has to stop and use his Albuterol inhaler to regain normal breathing. (R. 34). In fact, he testified that this shortness of breath was his primary reason for quitting his last job in 2005 at Days Inn. (R. 43). The claimant also testified that he was not being treated for his shortness of breath by Foster Jones, his treating CRNP at Capstone; however, if "anything is wrong," he could let Dr. Jones know because he sees him on a regular basis. (R. 44). Despite these breathing issues, the claimant told the ALJ that he smoked one pack of cigarettes per day until about three months prior to the hearing. (R. 56).

The claimant also testified that fatigue is one of his "big problems." (R. 37). He told the

ALJ that "at any given time, … [he] can just fall asleep," (R. 38) even when he is not engaging in any activity. (R. 36). When asked if being tired interfered with simple day-to-day activities, the claimant testified that it does; the urge to fall asleep "just periodically comes on [him]." (R. 41). But despite these periodic bouts of uncontrollable fatigue, the claimant testified that he drives to the store, sweeps, dusts, watches television, and helps his roommate with various tasks that he cannot complete alone because his roommate is legally blind. (R. 47). In addition to his daytime fatigue, the claimant testified to not being able to sleep at night, as he "wake[s] up about after an hour" and "can't stay asleep one, whole night." (R. 36). His physicians prescribed Vistaril, but he claims it is not helping his insomnia. (R. 37).

The claimant further testified that he had one-half of his stomach removed because of bleeding ulcers about 20 years ago. (R. 35). He believes his thinness and anemia may both be results of this gastrectomy. Id. He stated that he has to eat "six small meals a day instead of three regular meals like most people eat" because his stomach will not hold that much food at one time. (R. 36). The claimant also testified that he takes Zoloft for his depression resulting from the deaths of his mother and sister. (R. 39). The Zoloft helps his depression and "keeps [him] from getting depressed." Id. But later in the hearing, the claimant testified that his emotional problems would interfere with his ability to work, apparently despite the fact that his anti-depressant medication is working. (R. 47).

The claimant also testified to his extensive history of drug abuse, which began when he was 14 years old, and ended about three years prior to the hearing when he quit work and started going to a methadone clinic. (R. 32, 43). The claimant then admitted to his past alcohol abuse, but asserted that "alcohol is not a problem" even though he still drinks a couple of times a week

and recently "was drinking six beers a day" (R. 32 - 33). Furthermore, the claimant testified to being diagnosed with hepatitis C; however, he does not suffer from any symptoms. (R. 41) He was turned away from the UAB Liver Center for treatment. (R. 48). The claimant testified that he was not certain why he was deemed ineligible, but admitted that it probably had to do with his past drug and continued alcohol use. (R. 48-9).

A vocational expert, Dr. Mary Kessler, testified concerning the claimant's type of past employment and what skills he was able to perform. (R. 54). She stated that the claimant's job as a cashier was light and unskilled, while his job as a motel clerk was light and semiskilled; his skills as a clerk "would be transferable to other light clerical jobs but not to sedentary ones because [they] would require higher skill levels." (R. 54). The ALJ then posed the following hypothetical to Dr. Kessler:

> Let's assume a hypothetical person of Mr. Drummond's age, education, and work experience and let's assume that this hypothetical person can do simple but not complex tasks but could maintain attention and concentration for two hours at a time, complete an eight-hour day, provided all customary breaks were given. Supervision should be supportive and non-confrontational. Changes in the work setting should be gradual, well explained and infrequent. He . . . needs a work environment that is free of dust, fumes and gases and temperature and humidity control and he would be unable to work around unprotected heights or dangerous or moving equipment and no ladders, ropes or scaffolds. With these hypothetical limitations . . . if he was put at the light level of exertional activity, would he be able to return to his past work as a cashier . . . as performed in the national economy?

Dr. Kessler answered in the affirmative. (R. 54-55).

The ALJ further questioned that if he finds the claimant is unable "to maintain persistence and pace consistently for two hours at a time on a regular… basis, throughout

a 40-hour work week," would that disqualify the claimant from returning to work? (R. 55). Dr. Kessler testified that such a "limitation would preclude any type of work." <u>Id.</u>

During the hearing, the ALJ expressed concern that "so many of [the claimant's] problems" could be related to his use of methadone and prior drug use. (R. 45). Near the conclusion of the hearing, the ALJ requested that the claimant's counsel offer objective medical evidence that something other than methadone caused the claimant's fatigue (R. 52) and also for objective medical evidence that would establish his physical limitations. (R. 56-57). In response, the claimant submitted a letter from Nurse Practitioner Jones stating, "COPD and depression cause fatigue." (R. 389). The claimant also submitted a letter from Dr. Tom Welch of the Birmingham Metro Treatment Center stating, "Methadone does not cause COPD." (R. 387).

*The ALJ's Decision*

On September 24, 2008, the ALJ issued a decision finding no disability. (R. 20). First, the ALJ found that the claimant had not engaged in any substantial gainful activity since the alleged onset of his disability. (R. 15). Next, the ALJ found that the claimant had the following severe impairments: peptic ulcer disease, which led to a gastrectomy; hepatitis C; chronic obstructive pulmonary disease; fatigue; affective mood disorder; and methadone dependence. <u>Id.</u> However, the ALJ concluded that these impairments did not singly or in combination manifest the diagnostic findings required to medically equal a Listing. <u>Id.</u>

The ALJ found that the claimant has mild to moderate restrictions in his daily living activities; but, the record indicates that the claimant is capable of performing "activities of daily living such as light housework." <u>Id.</u> Furthermore, the claimant reported that he gets along with everyone, and that he was able to cook and drive. (R. 20). The ALJ further found that the

claimant's ability to concentrate proved normal in his examination. Id. After considering the evidence presented in the record, the ALJ concluded that the claimant's "impairments could reasonably be expected to produce the alleged symptoms," but that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent" with the evidence and RFC assessment. (R. 18).

To support his conclusion, the ALJ referenced the state agency psychologist's evaluation in May 2006 of the claimant's mental impairments. (R. 19). The psychologist evaluated the claimant's impairments under the Listings, but found the claimant to have only moderate restrictions of daily living activities, moderate limitations in social functioning, and mild limitations in concentration. He was capable of shopping, cooking and driving and got along with everyone. Despite the claimant's methadone dependency, he had no mental health complaints. He also had showed no problems concentrating. The ALJ gave significant weight to the state psychologist's opinions because they were consistent with the medical evidence of the record. The ALJ also gave significant weight to the pulmonary function studies conducted by the Disability Determination Service, and the treatment notes from the Birmingham Metro Treatment Center, because they were also both consistent with the medical evidence of the record when considered in its entirety. Id.

Based on these treatment notes, studies, and opinions, the ALJ concluded that the claimant's allegations of the severity of his limitations found no support in the medical evidence of the record. Id. Also influencing the ALJ's findings were the following: despite the claimant's allegations of shortness of breath, he continued to smoke one pack of cigarettes per day until three months prior to the hearing; his pulmonary function tests were not close to Listing levels;

even though he looked frail at the hearing, the record indicates that he admitted to always being very thin; and despite his pneumonia, other medical records indicate normal respiratory function. In addition, the claimant admitted to a continued use of alcohol, even though he was on methadone treatments and had been diagnosed with hepatitis C. Id.

The ALJ also found inconsistencies between the claimant's testimony and the medical evidence of the record. While the claimant testified that his primary limitation was his fatigue, he denied any fatigue in his visits to Capstone. Id. In addition, he claimed that his emotional problems and depression would interfere with his ability to return to work, but medical records indicate that his depression was well under control and that he was doing well on Zoloft. (R. 19 - 20).

After consideration of the record, the ALJ concluded that the claimant had the RFC "to perform the exertional demands of light work with the following limitations: no exposure to dust, fumes, gasses, temperature extremes, and humidity; unable to work around unprotected heights or dangerous moving machinery, ladders, ropes, or scaffolds. Furthermore, he would be limited to performing simple not complex tasks and maintain attention and concentration for those tasks for an 8 hour day provided customary breaks were given; supervision should be non-confrontational and supportive; and changes to the work setting should be gradual, well explained, and infrequent." (R. 17). Based on these findings and the testimony from the vocational expert, the ALJ concluded that the claimant retained the ability to perform his past work as it is actually and generally performed in the national economy. (R. 20). Therefore, he concluded that the claimant is not disabled under the Social Security Act. Id.

## VI. DISCUSSION

The claimant argues that the ALJ's hypothetical posed to the vocational expert setting forth the claimant's RFC of a reduced range of light work inaccurately described the claimant and his limitations because it did not mention the claimant's alleged limitations and diagnoses. Particularly, the claimant points to the fact that the ALJ failed to mention the claimant's alleged fatigue associated with any of his medical conditions, and that he also failed to include the claimant's various diagnoses, including the COPD. To the contrary, this court finds that the ALJ posed a proper hypothetical to the vocational expert and that substantial evidence supports his decision.

The ALJ must pose a hypothetical question to the vocational expert that comprehensively describes the claimant's impairments. Pendley v. Heckler, 767 F.2d 1561, 1563 (11th Cir. 1985). However, the ALJ is not required to include findings in the hypothetical that the ALJ found to be unsupported by the evidence. Crawford, 363 F.3d at 1161. RFC is an assessment, based upon all of the relevant evidence, of a claimant's remaining ability to do work despite his impairments. Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997); see also 20 C.F.R. §§ 404.1545(a), 416.945(a). The ALJ makes this determination by considering the claimant's ability to lift weight, sit, stand, push, pull, etc. 20 C.F.R. §§ 404.1545(b), 416.945(b).

The claimant argues that the ALJ erred in not including the claimant's various diagnoses in the hypothetical posed to the vocational expert. Particularly, the claimant argues that the ALJ erred by not mentioning the claimant's fatigue and COPD in the hypothetical. The claimant additionally argues that the ALJ's presumption that the claimant could maintain attention and concentration for two hours at a time and complete an eight hour work day, provided all

customary breaks were given, was improper. However, the ALJ is not required to include diagnoses in his hypothetical that he finds to be unsupported. The ALJ properly excluded the claimant's fatigue from the hypothetical as a result of the lack of objective medical evidence supporting the alleged affliction. Not only does the record suggest that his depression, which causes fatigue, is under control, but the claimant also did not consistently complain of fatigue when he eventually did make his medical appointments.

Regarding the COPD, the ALJ included a limitation in the hypothetical — that the claimant should have a work environment free of dust, fumes, and gases and that the environment should be temperature and humidity controlled — that takes his breathing difficulties into account. The ALJ was not required to include the COPD diagnosis in the hypothetical as he determined that the severity of the claimant's limitations was not supported by credible medical evidence of the record. Not only did the claimant's pulmonary function tests come no where close to the Listing level, but the claimant also testified at the hearing that his Albuterol inhaler helps him regain normal breathing when he does find himself short of breath. Additionally, the ALJ considered the claimant's failure to make at least seven of his follow up medical appointments, as well as his continued smoking, as a discredit to the intensity of his symptoms as alleged in his testimony.

The ALJ's presumption in his hypothetical that the claimant could maintain attention and concentration for two hours at a time and complete an eight hour work day, provided all customary breaks were given, was also appropriate. The ALJ properly relied on the state agency psychologist's evaluation of the claimant's mental impairments that revealed that the claimant was able to concentrate and was persistent during the evaluation. The psychologist opined that,

based on the claimant's ability to maintain concentration, the claimant could understand, remember, and complete simple tasks. Additionally, the claimant admitted to being capable of shopping, cooking, driving, and helping his legally blind roommate with daily activities, all activities that require a certain level of concentration.

Based on the explicit findings of the ALJ, this court concludes that he posed a proper hypothetical to the vocational expert that accurately described the claimant and his limitations. The hypothetical likewise set forth the claimant's correct RFC of a reduced range of light work — a finding supported by credible and substantial evidence of the record when considered in its entirety.

The claimant also argues that the ALJ committed reversible error in not awarding benefits to the claimant based on the medical vocational guidelines, or "Grid" rules. To the contrary, this court finds that the ALJ properly excluded any application of the Grids to this case.

"After determining a claimant's residual functional capacity (RFC) and *inability to return to past relevant work*, the ALJ may use the Grids to determine whether other jobs exist in the national economy that a claimant is able to perform." Phillips v. Barnhart, 357 F.3d 1232, 1240 (11th Cir. 2004) (emphasis added). To reach the fifth step of the sequential evaluation process, the claimant must prove, and the ALJ must find, that he is unable to perform his past relevant work. 20 C.F.R. §§ 404. 1520, 416.920. "A negative answer to any question, besides step 3, [of the five-step, sequential evaluation process] leads to a determination of 'not disabled'." McDaniel, 800 F.2d at 1030; 20 C.F.R. §§ 404.1520, 416.920.

The claimant argues that he is disabled under Rule 201.06 of the medical vocational guidelines, or Grids. However, the Grids are only applied at step 5 of the sequential disability

evaluation after the ALJ has found that the claimant cannot perform his past relevant work. The Grids are thus inapplicable in this case because the ALJ made his "not disabled" determination at step 4 of the evaluation and was not required to reach step 5.

Because substantial evidence supports the ALJ's determination that the claimant *can* perform his past work based on his residual functional capacity of a reduced range of light work, the ALJ was not required to reach step 5 of the sequential disability evaluation process and apply the Grids to the claimant's case.

## VII. CONCLUSION

The court has carefully reviewed the entire record in this case and finds that substantial evidence supports the Commissioner's decision and that the Commissioner applied proper legal standards in reaching that decision. Accordingly, the court affirms the decision of the Commissioner.

The court will enter a separate Order in conformity with this memorandum opinion.

DONE and ORDERED this 21st day of March 2012.

_____
KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE